An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-735
NORTH CAROLINA COURT OF APPEALS

Filed:  6 May 2014

STATE OF NORTH CAROLINA

   v.

LATEISHA MARIA JANDREAU

Currituck County
Nos. 10 CRS 50796; 50914

Appeal by defendant from judgments entered 28 September 2012 by Judge Jerry R. Tillett in Currituck County Superior Court.  Heard in the Court of Appeals 9 December 2013.

*Attorney General Roy Cooper, by Special Deputy Attorney General H. Dean Bowman, for the State.*

*Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Charlesena Elliot Walker, for defendant.*

McCULLOUGH, Judge.

Lateisha Maria Jandreau ("defendant") appeals from her convictions for first degree murder and larceny of a firearm. For the following reasons, we find no prejudicial error.

## I. Background

This case was called for jury trial at the 24 September 2012 Criminal Session of Currituck County Superior Court, the

Honorable Jerry R. Tillett, Judge presiding, upon indictments charging defendant with one count of first degree murder and one count of larceny of a firearm.

Evidence during the presentation of the State's case tended to show the following: Co-workers of defendant's husband, Paul Jandreau (the "victim"), became concerned and called the Currituck County Sheriff's Department on the morning of 30 June 2010 when the victim did not show up for work and did not answer their phone calls. Deputy Sheriff Lisa Starcher responded to the victim's and defendant's residence at 100 Armstead Court to perform a welfare check at approximately 7:44 a.m. Deputy Starcher testified that the victim's truck was in the driveway but no one answered the door. Deputy Starcher then looked around the house and through some windows. She noticed two cars in the garage but did not see any movement inside the house. After Deputy Starcher's call to the residence went unanswered, Starcher was able to reach defendant through defendant's place of employment. At Deputy Starcher's request, defendant returned home at approximately 8:30 a.m. and allowed Deputy Starcher to check the house. Deputy Starcher found nothing suspicious.

Deputy Starcher returned to the residence later that afternoon to see if the victim had returned. The victim's truck

was still in the driveway but no one answered the door. Deputy Starcher testified that windows which had previously been uncovered were now covered with a blue tarp, tin foil, or frosting.

The following day, 1 July 2010, Deputy Starcher continued to check on the residence. At approximately 11:40 a.m., Deputy Starcher and Detective Swany Dudley returned to the residence and saw the victim's truck backed up to the front door with furniture in the back. Detective Dudley testified she spoke with defendant. Defendant informed Detective Dudley that she had last talked to the victim on 29 June 2010 and that she and the victim lived together, but led separate lives. Detective Dudley further testified that defendant avoided eye contact, kept rubbing her head and neck, and seemed frustrated and agitated that they were there.

Detective Sergeant Ray Matusko testified that on 1 July 2010, he and another officer went to Elizabeth City after they received information that the victim's cell phone was hitting off a tower in the area. That afternoon, the victim's cell phone was found near a construction site in Elizabeth City and turned over to police. Detective Matusko recovered the cell

phone and met with the man that found the cell phone at approximately 2:30 p.m.

At approximately 5:30 p.m. on 2 July 2010, Detective Dudley, Detective Matusko, and others returned to the residence for a pre-arranged meeting with defendant. No one answered the door, but a note near the door indicated defendant had walked to River's Edge, an adjacent neighborhood. Officers tried calling defendant's cell phone and searched River's Edge but did not locate defendant. During this search, Detective Dudley received information from the dispatcher that defendant had just called 911 wondering why officers were at her residence and informing 911 she was in Chesapeake, Virginia. Defendant said she would not be home until the following day. The dispatcher, however, was able to determine that defendant's call originated from inside the residence. The information from the dispatcher was supported by a neighbor who informed Detective Matusko that defendant was home. The neighbor further informed Detective Matusko that the victim told him about a month ago that he was going to file for divorce and had asked defendant to move out.

At that point, the officers determined they had gathered enough information and applied for and obtained a warrant to search the house.

Officers returned to the residence just after midnight on 3 July 2010 to execute the search warrant. When no one responded to their knocks, the officers made a forced entry through a garage door. During their sweep to secure the residence, defendant was found hiding in the back of a closet covered by a blanket and clothes. After defendant was secured and served with the warrant, the officers performed a more thorough search of the residence.

During the search, the victim's body was discovered wrapped in plastic and duct tape and stuffed inside a large tote under a pile of trash in the garage. Officers also found various cleaning supplies in the residence and noted that it looked like the hardwood floor in the master bedroom had been scrubbed. There were bloodstains on a large rug in the master bedroom and bullet holes in and near the master bedroom which had been filled with caulk. Spent bullets were recovered from the scene. It was determined that the projectile paths for all the bullets originated from the interior of the bedroom out. Plastic wrap, foil, duct tape, paint, caulking, paint brushes, and frosted glass spray were found in the kitchen. A witness noted that these items appeared out of place in the kitchen and seemed to have had a role in the events of the week.

Two vehicles in the driveway were also searched. The search of a BMW registered to the victim and defendant resulted in the recovery of a .45 caliber handgun from a small black bag in the rear passenger side seat. The magazine in the handgun was empty. Two additional magazines recovered from the bag contained live rounds. The search of a truck in the driveway resulted in the recovery of a Lowe's receipt dated 1 July 2010 evidencing the purchase of a large tote.

A forensics firearms examiner testified that he had been of the opinion that the spent bullets recovered from the crime scene were fired from the .45 caliber handgun recovered from the BMW. The handgun belonged to Lyle Koenig, with whom defendant worked and had become very close personal friends. Koenig testified he never gave defendant permission to take the .45 caliber handgun.

An autopsy performed on the victim's body revealed he was shot five times: in the chest, abdomen, thigh, hand, and neck. The wound to the victim's neck appeared to have been inflicted from close range. The autopsy further revealed that the victim suffered approximately a dozen lacerations to his head, consistent with being struck by a blunt hard object such as a pistol.

Testimony from neighbors, co-workers, and an attorney revealed that both defendant and the victim had mentioned the victim wanted a divorce. The victim also told a co-worker and his attorney that he had awaken one night to find defendant crawling around his room in the middle of the night. He told his attorney that, as a result, he was sleeping with his door locked.

Following the presentation of the State's case, defendant took the stand in her own defense and testified to the following: She moved into the victim's residence at 100 Armstead Court after they married on 28 June 2003. They attempted to start a family together, but grew apart after they were unsuccessful in their attempts to have children. In January 2010, she and the victim decided they would live together but lead separate lives. Defendant testified that after the decision was made to live separate lives, they only communicated by text and rarely saw each other.

Defendant testified that the victim was always angry with her and in early June 2010, the victim informed her that he wanted her out of the house by the end of the month. Defendant told the victim she was not leaving. It appears from

defendant's testimony that their relationship had been volatile from that point forward.

Defendant testified that the victim would kick her door early every morning and tell her that he wanted her out of the house. The situation then escalated when, on 20 June 2010, the victim accused defendant of keying his car. Defendant testified that after speaking with an officer, the victim entered the house, poked her head with his index finger, and told her he wanted to put a bullet through her thick skull. That evening, defendant went to retrieve a gun from a toolbox in the garage. When the gun was not in the toolbox, defendant drove to Koenig's house and took his .45 caliber handgun, which she kept with her at all times thereafter.

At approximately 4:00 p.m. on 29 June 2010, defendant knocked on the victim's door to tell him she would not be out of the house by the end of the month. Defendant testified that the victim opened his door screaming, got in her face, and told her that he wanted her out. Defendant left and did not return until approximately 11:00 p.m. When she returned all the lights were out and she went straight to her bedroom to get ready for work. Defendant testified she went to sleep around 3:00 a.m. on 30 June 2010.

Defendant claims she was awakened at approximately 4:00 or 4:30 a.m. when the victim entered her room telling her he wanted her out of the house. Defendant testified the victim grabbed her by her feet and dragged her down the hallway before he let go and returned to his bedroom. Defendant then went back to bed. Defendant testified that shortly thereafter, the victim returned to her bedroom with a long gun and told her she had five minutes to get out of the house or he would kill her. The victim, again, returned to his bedroom. Defendant testified she thought the victim was going to kill her.

According to defendant's testimony, defendant jumped up, got the .45 caliber gun from the side of her bed, and ran down the hallway. When defendant got near the victim's bedroom door, she saw a shadow and shot at it. She then walked further into the victim's bedroom and shot in the direction of the victim. Defendant testified that the victim backed away, dropped his gun, and then walked forward and jumped towards her, falling on top of her. Defendant kept shooting and hitting victim with the gun. Defendant was able to crawl out from underneath the victim after a couple of seconds. Defendant testified when she got up and saw the blood on the floor, she started cleaning.

When asked to describe the days following the incident, defendant stated that during those days her mind was blank and she could not focus. Defendant also testified that she did not recall detectives coming to her house in the days following the incident.

On cross-examination, defendant admitted to having lied to officers and the victim's co-workers when she told them she did not know where the victim was. Defendant testified that she remembered cleaning the residence after the incident, renting a storage unit, and purchasing a larger tote for the body. Defendant also acknowledged that she had dumped the victim's phone in Elizabeth City.

The jury was given the case on 28 September 2012 and on the same day returned verdicts finding defendant guilty of first degree murder and larceny of a firearm. The trial court then entered separate judgments sentencing defendant to a term of six to eight months imprisonment for the larceny of a firearm conviction and to a consecutive term of life imprisonment without parole for the first degree murder conviction. Defendant gave notice of appeal in open court immediately following sentencing.

## II. Discussion

On appeal, defendant challenges the trial court's instructions to the jury concerning the issue of her guilt of first degree murder and the way the trial court handled her objection and motion to strike alleged 404(b) evidence.

1. and 2. Jury Instructions on First Degree Murder

During the charge conference, the trial court informed the parties that it would "instruct generally using pattern 206.10 regarding first degree murder where a deadly weapon is used which covers lesser included offenses and self-defense." The parties were in agreement that the possible lesser included offenses were second degree murder and voluntary manslaughter; involuntary manslaughter was excluded. The trial court also indicated it "intend[ed] to give all of the potential parenthetical issues for the jury under the second issue regarding self-defense[]" such as size, age, and strength of the defendant. Neither party took issue with the proposed instructions.

Thereafter, the trial court instructed the jury with respect to first degree murder and self-defense, excluding a no duty to retreat instruction and including an initial aggressor instruction.

Defendant did not object to the jury instructions at trial. Yet, in the first two issues on appeal, defendant contends the trial court plainly erred in instructing the jury with respect to first degree murder. Specifically, defendant contends the trial court should have given a no duty to retreat instruction and should not have issued an initial aggressor instruction.

As provided in the appellate rules,

> [i]n criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.

N.C.R. App. P. 10(a)(4) (2014). The North Carolina Supreme Court "has elected to review unpreserved issues for plain error when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence." *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996).

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness,

> integrity or public reputation of judicial
> proceedings[.]

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations and quotation marks omitted).

<u>Lack of a No Duty to Retreat Instruction</u>

Defendant first argues the trial court plainly erred in failing to give a no duty to retreat instruction as part of the instructions on self-defense because such an instruction was mandated by the evidence.  While we hold the trial court's failure to give a no duty to retreat instruction was erroneous, it was not plain error.

"Where the defendant's or the State's evidence when viewed in the light most favorable to the defendant discloses facts which are 'legally sufficient' to constitute a defense to the charged crime, the trial court must instruct the jury on the defense.  If an instruction is required, it must be comprehensive."  *State v. Everett*, 163 N.C. App. 95, 100, 592 S.E.2d 582, 586 (2004) (quotation marks and citations omitted).

In this case, the trial court instructed the jury concerning self-defense.  This Court has stated, "[a] comprehensive self-defense instruction requires instructions that a defendant is under no duty to retreat if the facts warrant it, and it is error for the trial court not to give this

instruction if it is requested." *State v. Davis*, 177 N.C. App. 98, 102, 627 S.E.2d 474, 477 (2006) (citing *Everett*, 163 N.C. App. at 100, 592 S.E.2d at 586). "Where a defendant's right to stand his ground and shoot an assailant in self-defense is a 'substantial feature' of a defense, it is error for the trial court to fail to give the instruction, even in the absence of a special request therefor." *Id*. at 103, 627 S.E.2d at 478 (quotation marks omitted).

> "There is *no* duty to retreat when (1) the person assaulted is confronted with an assault that threatens death or great bodily harm or (2) the person assaulted is not confronted with an assault that threatens death or great bodily harm and the assault occurs in the dwelling, place of business, or premises of the person assaulted, provided the person assaulted is free from fault in bringing on the difficulty."

*Everett*, 163 N.C. App. at 100, 592 S.E.2d at 586 (quoting *State v. Allen*, 141 N.C. App. 610, 618-19, 541 S.E.2d 490, 497 (2000), *disc. review denied*, 353 N.C. 382, 547 S.E.2d 816 (2001)). "'[A] person is not obliged to retreat when he is assaulted while in his dwelling house . . . whether the assailant be an intruder or another lawful occupant of the premises.'" *Id*. at 100-01, 592 S.E.2d at 586 (quoting *State v. Browning*, 28 N.C. App. 376, 379, 221 S.E.2d 375, 377 (1976)).

In support of her argument that a no duty to retreat instruction was mandated by the evidence, defendant compares the facts of her case to those in *State v. Everett*, 163 N.C. App. 95, 592 S.E.2d 582 (2004).

In *Everett*, the defendant was convicted of second degree murder for shooting her husband in their home. *Id*. at 96, 592 S.E.2d at 584. During the trial, the defendant claimed self-defense and specifically requested an instruction that she had no duty to retreat. The trial court, however, refused to give the instruction while instructing the jury on self-defense. *Id*. at 99, 592 S.E.2d at 586. On appeal, this Court summarized the evidence as follows:

> In the case before us, the evidence shows that the argument and altercation that occurred between Everett and defendant began when Everett returned home and asked defendant if she had brought all of her things back from her mother's house. Everett and defendant began to argue and Everett pushed defendant down onto the couch after she announced she was leaving. Everett held defendant down by placing his hand on her neck and his knee in her shoulder. As Everett was restraining defendant, he told her that the only way she would leave the house would be on a stretcher. Everett got up and went into the kitchen. Defendant grabbed the gun in order to keep Everett off of her. Defendant walked towards the kitchen and Everett threatened to go get his gun and "kill everything in here." Defendant fired the gun

> only after Everett started coming towards her. She initially fired a warning shot but Everett continued in her direction. She then shot him several times as he was going down the hallway because she feared he was going to get the other gun.

*Id.* at 101, 592 S.E.2d at 587.

Guided by our prior decision in *State v. Brown*, 117 N.C. App. 239, 450 S.E.2d 538 (1994) (ordering a new trial because the defendant was entitled to a no duty to retreat instruction), this Court granted the defendant in *Everett* a new trial, holding the defendant was entitled to a no duty to retreat instruction because "[t]he evidence in the case . . . [was] legally sufficient to support a conclusion that [the] defendant was attacked by her husband in her own home and that she was not at fault." *Everett*, 163 N.C. App. at 102, 592 S.E.2d at 587. In coming to its conclusion, this Court noted that in both *Brown* and *Everett* there were histories of domestic problems, killings in the marital home after the defendants attempted to leave, and the defendants did not kill until the threat of death was imminent. *Id.*

In response to defendant's argument, the State attempts to distinguish the present case from *Everett* and *Brown* on the basis that there was no immediacy to the threat to defendant where the victim had left the defendant and returned to his own bedroom.

The State further asserts there was no evidence that defendant simply stood her ground or failed to retreat, but that defendant took affirmative action and pursued the victim.

Although we agree with the State that the present case is distinguishable from *Everett* and *Brown*, we hold the evidence, when viewed in the light most favorable to the defendant, mandated a no duty to retreat instruction, even absent a special request. Self-defense was a substantial feature of defendant's case and evidence was presented tending to show that the victim assaulted and threatened defendant in their home, leading defendant to fear for her life. On these facts, the trial court erred by failing to give an instruction that defendant had no duty to retreat.

Yet, we are not convinced the trial court's failure to give the instruction in question amounts to plain error. Defendant cites *State v. Davis*, 177 N.C. App. 98, 627 S.E.2d 474 (2006), to argue the error was sufficiently prejudicial. In *Davis* this Court held that where the defendant's "right to stand his ground was at least a 'substantial feature' of his defense of self-defense[]" and "[t]he jury found the defendant guilty of second degree murder[,]" the trial court's failure to instruct the jury that the defendant had no duty to retreat was plain error

entitling the defendant to a new trial. *Id*. at 103, 627 S.E.2d at 478. This Court reasoned that, based on the record, "[w]ithout an instruction that [the] defendant had the right to stand his ground when met with deadly force, the jury may have believed that [the] defendant acted with malice, requiring it to return a verdict of guilty of second degree murder." *Id*.

In this case, the jury convicted defendant of first degree murder on the basis of premeditation and deliberation. Thus, the jury not only determined the defendant acted with malice, but defendant acted with premeditation and deliberation. While self-defense and defendant's right to stand her ground were substantial features of defendant's case, given that the evidence of defendant's guilt was so substantial that the jury found defendant guilty of first degree murder based on malice, premeditation and deliberation, we find the trial court's error did not have a "probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334. Instead, a review of the entire record reveals compelling evidence against defendant supporting the jury's determination that defendant acted with malice, premeditation and deliberation.

<u>Instruction on Defendant as the Initial Aggressor</u>

Defendant next argues the trial court erred by giving an instruction about the extent to which defendant was the initial aggressor. Defendant contends there was no evidence to support such an instruction.

"The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *State v. Cameron*, 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973), *cert. denied*, 418 U.S. 905, 41 L. Ed. 2d 1153 (1974). "[A] trial judge should not give instructions to the jury which are not supported by the evidence produced at the trial." *Id*.

Regardless of whether the evidence supported the instruction about defendant as the initial aggressor in this case, the instruction did not amount to plain error. As our Supreme Court has explained,

> [t]he first-aggressor instruction is relevant to the finding of voluntary manslaughter. The jury would consider whether defendant was the aggressor if it first found that defendant killed because [s]he believed it necessary to kill in order to save [her]self and that defendant's belief was reasonable. In finding defendant guilty of first-degree murder, the jury must have found that defendant acted without just cause or excuse and with malice, specifically intending to kill the deceased

> after premeditation and with deliberation.
>
> Thus, by finding both that the killing was without just cause or excuse and with malice, the jury must have found either that defendant did not believe it was necessary to kill . . . in order to save [her]self from death or great bodily harm or that, if [s]he did, such a belief was not reasonable under the circumstances. Having so found, the jury never reached the question whether defendant was the aggressor in bringing on the affray; or, if the jury did reach it, the answer became immaterial. Any error in the instruction on the first-aggressor theory must have been harmless.

*State v. Reid*, 335 N.C. 647, 672-73, 440 S.E.2d 776, 790 (1994) (citations omitted).

### 3. Character Evidence

In the final issue on appeal, defendant argues the trial court erred by failing to sustain her objection to, or grant her motion to strike, evidence about her prior bad acts. Defendant contends this alleged error was prejudicial and she is entitled to a new trial. Upon review of the transcript, we disagree.

Pursuant to the North Carolina Rules of Evidence, only relevant evidence is admissible. N.C. Gen. Stat. § 8C-1, Rule 402 (2013). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen.

Stat. § 8C-1, Rule 401 (2013). Rule 404(b) provides "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2013).

The evidence defendant challenged as improper under N.C. Gen. Stat. § 8C-1, Rule 404(b) was admitted into evidence during testimony by Valerie Johnston, a co-worker of the victim. When questioned by the State about whether she was aware of the status of the victim's relationship with defendant, Johnston answered affirmatively and testified the victim had told her on 29 June 2010 that he was filing for divorce. When the State sought clarification that the victim had informed Johnston he filed for divorce on 28 June 2010, Johnston stated:

> [The victim] went to talk to the lawyer, then he said he had to go to the courthouse, and that [defendant] saw him when he was gone, when he was at the court. He mentioned that -- some information about previous problems they had that she believed she had stolen some articles --

As soon as Johnston mentioned stolen articles, defense counsel objected and moved to strike the testimony. When the trial court inquired as to the basis for the objection, defense counsel responded:

> Judge, it was my understanding before we

started the trial that there was not going to be a tender or offer of any 404(b) [e]vidence. I would contend that where she is going now would be that and if, in fact, that's the case, then I would request a *voir dire* and see what she is going to say.

The trial court then conducted a *voir dire*, during which the State made clear it did not intend to elicit testimony of defendant's prior conduct or pending lawsuits; instead the State sought only to inquire about the marriage. In response, defense counsel indicated he "thought that was [the State's] position[]" but "had to object because that's where we were going." Both parties then informed the court that they were "happy to just move forward with the jury."

Citing *State v. Alford*, 339 N.C. 562, 572, 453 S.E.2d 512, 517 (1995) (holding the trial court technically erred in failing to rule on an objection to an argument because failing to rule was tantamount to overruling the objection, but determining the error to be harmless), defendant now argues that, although no further testimony about her prior bad acts was elicited following the *voir dire*, the trial court's failure to rule on her objection and motion to strike was tantamount to overruling her objection and denying her motion to strike, thereby allowing the jury to consider the evidence. Defendant further contends this alleged error was prejudicial because the evidence was

irrelevant to the issue of whether she was guilty of the crimes charged and tended to suggest she was a bad person who was predisposed to commit other criminal acts.

Although Johnston's statement was irrelevant to the issue of defendant's guilt of first degree murder and larceny of a firearm, we hold the trial court's failure to explicitly rule on defendant's objection and motion to strike was not tantamount to a decision to overrule defendant's objection and deny defendant's motion to strike in this case. The transcript reveals that the trial court adequately addressed defendant's concerns during the *voir dire* and did not make a ruling following the *voir dire* because the defense indicated it was "happy to just move forward with the jury." It is conceivable that, where the challenged evidence was a single statement which would not be pursued further, the decision to "move forward with the jury[]" was a strategic move by the defense to avoid revisiting, and thereby highlighting, Johnston's testimony.

Moreover, assuming error, we hold the brief mention of stolen articles was harmless error given the evidence against defendant. In fact, the trial court's inquiry in the *voir dire* resolved the issue and served the same purpose as sustaining

defendant's objection, since no further testimony about defendant's prior bad acts was introduced before the jury.

## III. Conclusion

For the reasons discussed above, we hold defendant received a fair trial free of prejudicial error.

No prejudicial error.

Chief Judge MARTIN and Judge ERVIN concur.

Report per Rule 30(e).