IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-403

Filed: 7 April 2020

Robeson County, Nos. 12 CRS 55140, 3384–85

STATE OF NORTH CAROLINA

v.

MARQUES RAMAN BROWN

Appeal by defendant from judgments entered 5 March 2018 by Judge Robert F. Floyd in Robeson County Superior Court. Heard in the Court of Appeals 3 December 2019.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Adren L. Harris, for the State.*
>
> *Rudolf Widenhouse, by M. Gordon Widenhouse, Jr., for defendant.*

DIETZ, Judge.

Defendant Marques Brown shot and killed an off-duty police officer who was approaching Brown's car to arrest him on several active warrants. At the time, Brown was on edge because there had been several attempts on his own life by individuals who believed Brown had murdered a man named "Fat Boy."

In the several seconds after the officer pulled up in his car and got out, wearing ordinary civilian clothes, Brown glimpsed a handgun on the officer, although Brown admitted that the officer never pointed the weapon at Brown or motioned as if he

intended to use it. Brown then grabbed his own gun, pointed it out his car window, and killed the officer. Brown later explained that he feared for his life because "any time I ever seen somebody coming at me with a gun, it was shot."

Brown appeals his conviction for second degree murder on the ground that the trial court wrongly refused his request for instructions related to self-defense. We reject this argument. Viewing the evidence in the light most favorable to Brown, and considering the mind of a person of ordinary firmness, it was not reasonable for Brown to believe that it was necessary to shoot and kill the approaching officer to avoid serious bodily injury or death. Accordingly, the trial court properly declined to instruct the jury on these self-defense issues and we find no error in the trial court's judgments.

**Facts and Procedural History**

On the morning of 17 July 2012, Officer Jeremiah Goodson was off duty and running errands with his wife when he stopped at a gas station. At the gas station, Officer Goodson told his wife that he saw someone inside the store who had active warrants and that he needed to drop her off somewhere safe. Goodson took his wife to a nearby strip mall.

Officer Goodson then contacted his supervisor, Lieutenant Monteiro, to report that he located a subject with active warrants, Defendant Marques Brown. Goodson described Brown's clothing and vehicle and reported that Brown was with a woman

and a small child. Lieutenant Monteiro immediately instructed an on-duty officer, Officer Hayes, to respond to the gas station to assist in serving the warrants and making the arrest. Monteiro told Goodson to remain on the line and to keep sight of Brown in case he changed locations.

Officer Goodson reported that Brown's car moved to a nearby gas station parking lot. Officer Hayes testified that when he arrived at the parking lot, he blocked Brown's car with his patrol vehicle, while Goodson simultaneously pulled his personal vehicle beside Brown's car. Hayes saw Goodson step out of his car and take a single step towards the store before being struck by multiple gunshots. A cashier working at the gas station witnessed the incident and testified that she saw Goodson exit his car in the parking lot, that Goodson was "looking in the store like he's looking for somebody," and then "his shirt starts to change colors and he hits the ground." A customer at the gas station testified that he heard multiple shots and saw a hand holding a gun out the window of Brown's vehicle.

Immediately after the shooting occurred, Officer Hayes drew his weapon and approached Brown's vehicle where Brown was sitting in the passenger seat. The front and back passenger windows were partially rolled down. Hayes opened the door of Brown's vehicle and ordered Brown to get out. Hayes saw a gun lying in the front passenger seat. The gun had a ten-round capacity with six bullets remaining.

Captain Johnny Coleman arrived on the scene after learning that an officer was down and observed Goodson lying face down between his vehicle and Brown's vehicle. Goodson was dressed in plain clothes and his head was facing towards the store. When they rolled Goodson over, there was a gun lying underneath him.

Brown told the officers that he was not aware the man he shot was a police officer. He explained that Officer Goodson "had a gun in his hand," although he also asserted, conflictingly, that he "didn't see the gun." When asked about the gun, Brown also told the officers that Goodson didn't "raise it and point it at me or nothing."

On 3 August 2012, Brown was indicted for first degree murder of Officer Goodson, possession of a firearm by a felon, and possession with intent to sell or deliver marijuana. The case went to trial on 19 February 2018.

At trial, Dr. Richard Johnson testified that he performed the autopsy on Officer Goodson and found four gunshot wounds: two in the chest, one in the left side of the face, and one in the back of the head. Goodson's cause of death was one of the gunshot wounds to the chest that was fired from close range and hit the heart.

The State presented surveillance footage of the gas station parking lot while a detective described what was shown in the video. At 11:00:00, Goodson's car comes into view and approaches the passenger side of Brown's vehicle while Hayes's marked patrol car approaches the rear of Brown's vehicle. At 11:00:03, Goodson's car comes to a stop and the driver's side of Goodson's car begins to open. At 11:00:05, Goodson

starts to step out of his car. At 11:00:06, Goodson is out of his car and standing, and the door of his car starts to close. At 11:00:07, Goodson's head starts to drop, he starts to fall forward, and then is down on the ground. At the same time, the patrol car door opens and Hayes rushes out.

The entire incident, from Goodson's approach in his car to his collapse to the ground, took approximately seven seconds. Goodson was out of his car for only two seconds. The State also presented dashcam footage of the shooting from Hayes's patrol car showing the same timeline of events.

Brown testified that he had a difficult childhood due to his mother's drug addiction and witnessing multiple violent incidents as a child. He also explained that there were attempts on his own life by people who believed that Brown was involved in the murder of a man named "Fat Boy."

Brown testified that when he saw Goodson's car pull up beside him, he grabbed his gun and took the safety off while the car was still pulling up. Then he saw a man "looking at me like real mean, like with hate . . . sliding out the car . . . like with a gun." Brown then shot at Goodson through the back passenger window because Brown believed he had a clearer shot through that rolled down window. Brown only recalled firing three shots.

Brown testified that his actions were "like a reflex." He explained that he saw a "glimpse of a gun" as Goodson got out of his car but conceded that Goodson never

pointed a gun at him or motioned as if he intended to fire a gun. Brown fired his own gun because, having seen a glimpse of a gun on Goodson, he believed Goodson intended to kill him. Brown explained that "any time I ever seen somebody coming at me with a gun, it was shot. And this is close contact . . . it was too intense."

Brown presented expert testimony from Dr. George Corvin that Brown has a "mild intellectual disability" with an IQ of 69 and that Brown suffers from PTSD, which "impaired" his ability to "perceive what is going on" and "to react to stress appropriately." Dr. Corvin testified that, in his opinion, Brown shot Goodson because he believed Goodson "was going to kill him, was going to shoot him, or at least try to."

During the charge conference, Brown requested instructions on self-defense and on the lesser-included offense of voluntary manslaughter based on imperfect self-defense. The trial court denied Brown's requests, explaining "it doesn't rise to self-defense, because there's no threat of deadly force been presented against him of this defendant at all. The evidence would show now the defendant jumped the gun, and speculated, and he could have speculated that anybody getting out of the car. He made his mind up, he testified when the car drove up quickly . . . . [A]s soon as the victim, Officer Goodson, cleared the vehicle, within three seconds he was dead on the ground, or he was on the ground. Never saw a gun drawn on him, assumed there was a gun drawn on him."

On 5 March 2018, the jury convicted Brown of second degree murder, possession of a firearm by a felon, and possession with intent to sell or deliver marijuana. The trial court sentenced Brown to 258 to 322 months in prison for second degree murder and a consolidated sentence of 21 to 35 months in prison on the remaining charges. Brown appealed.

**Analysis**

Brown argues that the trial court erred by denying his request for a jury instruction on self-defense. He contends that the evidence, taken in the light most favorable to him, required the trial court to include that instruction. Brown also argues that the trial court erred by denying his request for an instruction on the lesser-included offense of voluntary manslaughter based on imperfect self-defense. We reject these arguments.

"It is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence." *State v. Shaw*, 322 N.C. 797, 803, 370 S.E.2d 546, 549 (1988). For this reason, "where competent evidence of self-defense is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case." *State v. Morgan*, 315 N.C. 626, 643, 340 S.E.2d 84, 95 (1986). In other words, when the evidence, viewed in the light most favorable to the defendant, discloses facts that are "legally sufficient" to warrant an

instruction on self-defense, the trial court must give that instruction to the jury. *State v. Everett*, 163 N.C. App. 95, 100, 592 S.E.2d 582, 586 (2004).

Competent evidence of self-defense is evidence that it "was necessary or reasonably appeared to be necessary" for the defendant "to kill his adversary in order to protect himself from death or great bodily harm." *State v. Bush*, 307 N.C. 152, 160, 297 S.E.2d 563, 569 (1982). "[B]efore the defendant is entitled to an instruction on self-defense, two questions must be answered in the affirmative: (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable?" *Id.* Importantly, our Supreme Court has held that a defendant's belief is reasonable only if "the circumstances as they appeared to him at the time were sufficient to create such a belief *in the mind of a person of ordinary firmness*." *State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572 (1981) (emphasis added).

Brown argues that, applying this precedent, the trial court should have given a self-defense instruction because there was competent evidence that Officer Goodson "came toward him with his gun drawn." This, Brown contends, led him to believe that he was "about to be killed by a man he did not recognize."

The trial evidence does not support Brown's argument. Brown's testimony—viewed in the light most favorable to him—was that Officer Goodson pulled his car beside Brown's and that Brown saw "a glimpse of a gun" when Goodson "slid out the

car." Brown also testified that Officer Goodson "didn't say nothing" but was "looking at me like real mean, like with hate." Brown further testified that the gun he glimpsed "wasn't pointed at me." Still, Brown believed that Officer Goodson was attempting to kill him because "any time I ever seen somebody coming at me with a gun, it was shot."

Brown's trial testimony was corroborated by his statement to investigators following his arrest, which was admitted at trial. In that statement, Brown conflictingly asserted both that he saw a gun and that he "didn't see the gun." Regardless, when discussing Officer Goodson's gun, Brown explained that Goodson did not "raise it and point it at me or nothing."

Brown also presented expert testimony from Dr. Corvin, who explained that Brown "either saw the gun, or saw him getting the gun, or in one way, shape, form or fashion came to the conclusion that the individual getting out of the car was getting a gun or had a gun in his hand, was looking at him mean, had approached him in an unusually aggressive manner by speeding up and jumping out of the car." Thus, Dr. Corvin explained, Brown's "perception of the events quickly sort of with combined influences of post traumatic stress and his limited intellect is what he saw in his mind. . . . He interpreted that what was occurring was dangerous to him. He then impulsively says he took the gun."

The trial court properly concluded that this evidence was insufficient to create a *reasonable* belief that it was necessary for Brown to use deadly force to protect himself from death or great bodily harm. Specifically, whatever Brown may have *believed*—because he was on edge from an earlier attempt on his life, or because he was suffering from some form of post-traumatic stress, or for any other idiosyncratic reason—the evidence demonstrated that "in the mind of a person of ordinary firmness" there was no basis to use deadly force. *Norris*, 303 N.C. at 530, 279 S.E.2d at 572.

Uncontradicted witness testimony and video evidence presented at trial showed that Officer Goodson did not say anything to Brown, did not point a gun at Brown, and did not have any physical interaction with Brown. The entire incident lasted only seven seconds. During the first three seconds, Goodson pulled his car into the parking spot next to Brown's car and opened the car door. In the next two seconds, Goodson got out of his car and stood up. Then, less than two seconds later, Brown pointed a gun out his car window and shot and killed Officer Goodson.

Critically important, even Brown's own testimony acknowledges that Officer Goodson—at most—had a gun visible either on his body or in his hand. But the uncontroverted evidence, including Brown's own testimony, is that Officer Goodson was not pointing the gun at Brown or taking any action that indicated he was attempting to shoot Brown. The evidence, even in the light most favorable to Brown,

- 10 -

is that a car pulled up quickly near Brown's own car, that an unknown man stepped out of the car in possession of a handgun, and that the man looked at Brown in a manner that was "real mean" or full of "hate."

The trial court properly concluded that these facts are insufficient to permit a self-defense instruction. In the mind of a person of ordinary firmness, this evidence would not permit the use of deadly force on a complete stranger getting out of a nearby car. Accordingly, the trial court properly declined to give the requested instruction on self-defense. *See id; Bush*, 307 N.C. at 160–61, 297 S.E.2d at 569.

Brown also argues that the trial court erred in denying his request for an instruction on the lesser-included offense of voluntary manslaughter on the basis that the jury could have found Brown used excessive force in imperfect self-defense. *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002). Because, as explained above, the trial court properly concluded that there was insufficient evidence to support either perfect or imperfect self-defense as a matter of law, the trial court properly declined this request for an instruction as well. *State v. Owens*, 65 N.C. App. 107, 109, 308 S.E.2d 494, 497 (1983); *State v. Norman*, 324 N.C. 253, 260, 378 S.E.2d 8, 12 (1989). Accordingly, we find no error in the trial court's decisions to reject Brown's request for instructions on self-defense and the lesser-included offense of voluntary manslaughter.

## Conclusion

We find no error in the trial court's judgments.

NO ERROR.

Chief Judge McGEE and Judge ZACHARY concur.